And we will now hear the last case for argument for the day, which is United States v. Dencklau et al. Good morning, Your Honors, and may it please the Court. My name is Elizabeth Daly. I'm here on behalf of Appellant Chad Erickson. Okay, before you start, I just want to do some as I understand it, that you're going to go first for 15 minutes and Ms. Grazer is doing five minutes. Who's doing rebuttal, if anybody? That would be me, Your Honor. Okay, and how much of your 15-minute time are you going to try to save? I'm going to try to save five minutes, and I also understand that if Ms. Grazer doesn't use her full five minutes, then I can get a credit on my bank for that. Very good, and you're not in the same room, so there'll be no physical altercation, and we're grateful for that. We try to avoid that. Okay, all right, so please proceed then, Ms. Daly. Thank you, Your Honor. I'd like to start with the District Court's exclusion of expert testimony about Mr. Erickson's cognitive deficits, which effectively precluded the core defense theory of diminished capacity from reaching the jury. I believe the key question that this Court needs to decide is relevance, and specifically the relevance of the significant and undisputed cognitive deficits Mr. Erickson experienced relating to awareness, attention, and processing. These, of course, stemmed, at least in part, from an IED explosion that he experienced while he was deployed in Iraq that resulted in traumatic brain injury. Let me ask you this, Counselor. As I understand it, doesn't Rule 704B expressly bar expert testimony from opining, and I'm going to quote, whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Isn't that correct? Yes, Your Honor, that's correct. And why does that not address the question that you've just raised? Because, Your Honor, that rule only precludes the final conclusion, the ultimate conclusion of whether he actually acted with the mens rea applicable to the charges in this case, as opposed to predicate information that would have aided the jury in deciding that critical mens rea question. And that's what this Court held in Morales and several other cases, where they said that the information about how a person's brain works is not the same thing as telling the jury, and therefore, the person acted without intent. And so what we're asking for, or what worked. The jury could take in that information, and it could find that based on that information, he didn't have knowledge about Huggins kidnapping, and therefore, when he went to the Arco gas station and led the others to Dagwoods, he did not intend to facilitate the kidnapping. So from your perspective, then, Rule 704B does not address the time framework you're talking about. The expert could come on and testify whatever about his brain and the way it works, and yet later on, you can't do it? Is that the way it works? I'm not sure that it's a question of timing, but the specific opinion. And so another decision of this Court that I think is helpful on this is United States v. Rom, where the disputed testimony was an expert who said that this defendant who was charged with counterfeit currency had some visual processing deficits, where she sometimes had a tendency to overlook visual details. And so it supported the defense that she might not have known that this was a counterfeit currency. And the government raised the same argument, that this is basically reaching the final conclusion, and the Court said that that's not the case, that this is predicate information that would aid the jury's decision. Because, of course, it could also say, well, she had these, in Rom, she had processing deficits, but we think that under these circumstances, she knew that this was counterfeit currency. And it's the same situation here. But you think of it as a predicate thing. It seems to me, you know, once the cat's out of the bag, once the testimony is there, what role does Rule 704B play? You can't put the cat back in the bag. And, Your Honor, I do want to point out that the government hasn't argued that this testimony would violate Rule 704B. So that's not the disputed issue on appeal. But the reason it's not disputed is because the only thing that 704B precludes is the ultimate conclusion. The expert can't get on the stand and say, it is my opinion that this defendant, on June 30th of 2015, acted without the intent to facilitate a kidnapping. And that is not the testimony that we offered. Just tell me what's wrong with the district courts or what's incorrect with the district courts finding that this evidence would have been so confusing to the jurors, this neuroscience evidence, that whatever value it might have had would have been outweighed by that risk of confusion. Two answers to that, Your Honor. I think the first answer is that the court was only looking at the relevance with respect to what happened after the parties reached the property, Dagwood's property, where Mr. Huggins was then, you know, bound, beaten. It was obvious that this was a kidnapping, a crime that was in the course of happening. And so Mr. Erickson's testimony might have had significant relevance to those events. But what the district court never reached and never really considered is the government's alternative factual theory that Mr. Erickson was guilty before he reached Dagwood's because bits and pieces of information were coming into him. And the government argued, therefore, he must have understood that Huggins had been kidnapped. So let me ask you this. I don't know that the district court's 403 analysis was that limited. I think the problem in this case is that the expert testimony that you proffered really were so general. It goes to general cognitive impairments. And the fact is that the record shows he was able in different circumstances to form intent. Right. And so so that kind of generalized cognitive impairment evidence, I think that's what leads to the 403 balancing and the risk of confusion analysis. So how do you respond to the government's argument that this was just too generalized? Well, I think what the court overlooked was the significant relationship between the deficits that were not insanity defense reform act barred. So we had expert testimony that Mr. Erickson processes information slowly, does not accurately perceive other people's intentions, misses patterns that are apparent to others, and has trouble seeing the big picture. And then what we have with respect to the knowledge argument that the government presented is a very fast developing situation where Huggins had just been abducted. And we have no direct evidence that Mr. Erickson was ever told that that had happened. He certainly wasn't present. That was undisputed. And so the evidence was that he had some background information and that some phone calls were made to him. But the content of those phone calls was supposedly logistical. Fisher and Cripper now testified. We talked about meeting at the Arco and going to Dagwoods. And so the jury was called upon to decide in this fast moving circumstance, did Mr. Erickson intuit, infer, deduce that this was because Huggins had been abducted, that he had been violently abducted. That he couldn't put it all together. Is that correct? That he didn't have ability to put all these pieces together? Somebody in those circumstances might have put all that together. And the jury could reasonably conclude that this is very suspicious. He's getting all of these phone calls. He knows that they're looking for Huggins. He must have known what he was doing. But the expert testimony would have supported a reasonable jury in thinking that Mr. Erickson's brain did not reach those same deductions, inferences. And that's not addressed in Judge Mosvin's opinion. When he talks about Rule 403, he only talks about what happened in Dagwoods Shred. And certainly the cognitive deficits that we're talking about would have been less probative there. And so in weighing probative value versus prejudicial impact, the court's considering 95% irrelevant, maybe 5% relevant. And in that situation, it's very easy to find that the risk of prejudice and confusion, the jury is going to want the predicate offenses rather than just a general description. That's generally been what courts have found adequate. What's your best argument that the VICAR indictments should be treated differently? Well, I don't know that they should be treated differently. Our position is that the elements of the underlying predicate crime, in this case, the state murder or the federal kidnapping are elements of the, I'm going to call it VICAR, the VICAR counts. And this court held that in Elmore after we filed our opening brief, that the elements of the predicate crime are subsumed. And that's the standard for sufficiency of an indictment. But I think you're talking about a slightly different situation. We have not said that you have to delineate the elements of the underlying crime. Second Circuit, same way. I think you're saying we do have to say that. And I'm asking what your best argument is that the VICAR indictment has to delineate the underlying elements of the crime. Right, Your Honor. And the Second Circuit has distinguishable precedent. So what we're doing is we're adding two plus two and getting four, because the court does have direct precedent that says all elements have to be alleged. And now we have direct precedent saying this is an element. And so I think the only logical conclusion from that is that the VICAR indictments have to allege all elements, which this court has held includes the elements of the predicate. So you think that two plus two is still four in these days? It's always doubtful, Your Honor, but I'm hoping that this panel sees that. You've used up the time you want to. Do you want to save the balance of your time for rebuttal? I do, and I appreciate that. Thank you. Very well. Okay. So, Ms. Grazer, you're up. May it please the court. Laura Grazer for Mark Dunclow. I'm making myself available to the court for questions. I raised six issues. Four of them are joint issues, and I will leave those to Ms. Daly. If the court has questions about the two unique issues to Mr. Dunclow, that the defense was impaired by not permitting basically a 3D view of Mr. Prevenow, who was, I think everyone agrees, a very sadistic individual who conceived of the torture plan and generated the fatal blow. He had a history of extreme violence, and given that the defense was not allowed to attack his military record and show the 3D picture of that, the jury could have come off with a false impression that he did an excellent job in the military and everything was fine until he got involved with the Gypsy Jokers, and then he became this violent sadist, and that is a misleading view, and I will rest on my brief for that unless the court has questions. Do either of my colleagues have questions on this point? No, thank you. No, thank you. I think not, so please proceed with your other points then. And the pattern jury instructions are other unique unrelated to Mr. Erickson. The pattern jury instructions downplays the connection between the actions and the purpose to support the enterprise. I lay out the argument in my brief and in the reply brief. It's not simply simultaneous that you're a member of the enterprise and you commit violent acts. They have to be related directly that you did it for the purpose of. That's what the statutory language is, and the jury instruction misled the jury on that, and if the court has any questions on that. Other questions on that one? I think not. I will then leave. Ms. Daly has addressed the indictment issue, and I will leave the rest of my time to her for her rebuttal. Very well. All right. Thank you very much. All right, then let's hear from the government. Ms. Desai Rao, is that the correct way to say it? Yes, Your Honor. Please proceed. May it please the court, Sangita Rao on behalf of the United States. Turning to the expert issue first, the district court did not abuse its wide discretion in excluding the expert evidence. I think the easiest path here is for the court to resolve this issue under Rule 403 because that really encompasses all the considerations that were in play for the district court. This evidence had low relevance. Dr. Watson testified that Erickson could form intent in a lot of areas, and then much of his testimony was that Erickson had deficits in things like memory, processing, attention, impulse control, and overall executive functioning. But the district court acted within its discretion in believing those deficits had little relevance. Let's look at memory and attention. This isn't a fraud case about some little detail in a hundred-page document from three years ago. Erickson knew the victim Huggins. He had beaten him up before in that 2014 kidnapping when Huggins stole money from the bar. He knew Denklau was on the hunt for Huggins in retaliation for that robbery where Denklau's girlfriend was tied up. Everyone knew. Everyone on the street, gypsy jokers from out of town knew. Erickson actually told Folkerts on the day of the kidnapping why Erickson himself was taking a trip to Longview in a car, a vehicle suitable for kidnapping, and that was because he was looking for Huggins because of this robbery, because Denklau was looking for him. He could see and hear what was going on in the shed. His memory problems didn't prevent him from knowing what was going on. So much the memory issues, and for me, I don't think defense has a very good argument even on the capability to form specific intent given Dr. Jackson's testimony that he's capable of forming intent in other circumstances. I think what counsel's really saying is that, look, this guy is very slow to process, and given the fast-evolving situation, it is relevant to say that he didn't have the capacity, or at least it gives defense the ability to argue that he didn't have the capacity to fully grasp the situation, and that affects the district court's 403 analysis. How does the government respond to that? So, Your Honor, it's not actually a fast-moving situation. This situation had developed over months. Since the initial robbery had happened about a month earlier, everyone on the street knew what was going on, that they were looking. Everyone knew that the plan and intent had gotten worse, because after Denklau found the property when they did the home invasion of the drug dealers, and he found some of his property, and so he knew that Huggins, he definitely knew Huggins was involved. Everybody was looking for him, and then on the day of the kidnapping itself, it's not so fast-moving then either. This torture went on for hours and hours, and there was a continued kidnapping during that time, and these are not subtle intents. They're not subtle patterns. Erickson was a full-patched member of this gang. That takes a lot of effort to become a full-patched member. Of all those people who were there in the shed doing the torture, he was the third-highest ranking member. Denklau was the president, Fisher was the vice president, and then it was Erickson. Everybody else were associates, hangers-on, who were in the shed. So, he knew about what the violent gang ethos were, disrespected any kind. You didn't make your bed well, you got beat up when you were a gypsy joker. There was plenty of testimony. There were more than 80 witnesses who testified at this trial for six weeks about this violent gang and how any kind of disrespect led to violent retaliation. There were multiple kidnappings that had happened before, including to Huggins, for offenses that were much less egregious than this. So, that type of evidence, just there's general memory, general attention, general executive decision-making problems. In these circumstances, it wasn't relevant enough. Now, is it relevant a little bit? Some of it? Sure. Absolutely. These things have tiny bits of relevance. But what the district court really found was that in a four-or-three analysis, well, not all of it had relevance. The memory didn't have relevance. All that stuff about impulse control, that wasn't relevant. That goes to exactly what Congress and the courts have said is not appropriate. That's not the kind of thing that actually detracts from intent. And for all the reasons I've said, all that impulse control is not relevant. So, understanding others' intentions in a social setting, low awareness of surroundings. The district court said, yes, there is the minimal relevance, but there was huge risk of misleading the jury. And that was so substantial that the district court, exercising its wide discretion, determined that it wasn't worth the risk. The defense arguments themselves prove the point. Look at Erickson's brief at page 47, where Erickson asserts that the expert would have proved that that ex-mark-slash-the-prip-or-now witnessed Erickson putting over the tattoo. And the punch, Folkert said that he saw Erickson give huggins, that those were, quote, ill-considered and reactive acts, born of panic in the midst of crisis, rather than a conscious objective. But that's exactly the kind of evidence and argument about impulsivity and lack of reflection, that defeating intent that's wrong, but has a huge risk of misleading a jury to excuse defendant's conduct just for lack of reflection, lack of making a good choice. But that has nothing to do with culpable criminal intent, which is, if I take that Oreo cookie, I took it, even though it wasn't a good decision. That's the risk of misleading the jury here. The district court also said that the jury would give the testimony undue weight. In attempting to understand the dense expert testimony, the jury could stretch that offer far beyond the men's renegation purpose for which it could be used. And it would give the testimony extra weight to compensate for the limited scope of its admissibility. I'd urge this court to look at the Supreme Court's decision in Clark that we cite in our brief. If you look at pages 775 to 776, these are the exact concerns that the Supreme Court was talking about. Battles of experts and too much attention given to these vague concepts of psychological intent that don't match up with criminal intent, and the jury would be confused. So can I ask you, before your time runs out, to address the Vigar-Starch statute. We don't have any case law requiring elements for the predicate offenses, right? All the case law so far in the jury instruction context. Yes. So I think the way the court should approach this is to start with first principles. An indictment needs to be a plain, concise statement of the essential facts, just contain the elements of the charged crime in adequate detail so that a defendant is on notice and can plead double jeopardy. It should be read in its entirety according to common sense. This court has said that repeatedly, and also the intent element can be implied. And I point this court to the decision in Henry where just the word assault in the indictment implied intent. So those are the background principles, and there's no notice concerns here. At the time the district court was ruling on this motion, the government had already filed proposed jury instructions, and you can find that recited in our brief, but it's at 11 enclosed excerpts of record starting at 2264 and going to 2293. And there are all the elements of Oregon intentional murder and felony murder and Washington premeditated murder. They're all set forth. So the defendants were well aware of what they were defending against. But to go to the more specific question, the Vigar charge did not need to allege the elements of the underlying offense because a Vigar charge is not a federalized version of a state crime. It's its own offense. Now, one of the elements is that the defendant committed a violent crime in violation of state law or federal statutory. If it does map onto the statutory terms. Yes. And so it gives those statutory citations. And defense counsel mentioned United States versus Elmore. United States versus Elmore is on a completely different topic. It's on applying the categorical approach to the Vigar statute. But I urge, of course, look at Elmore. The indictment in Elmore is remarkably similar to this indictment. It says it's not a sufficiency of the indictment case, but it says Elmore unlawfully and knowingly did murder the victims in violation of California penal code. And then it cites the And then this court in Elmore did not find any error about this allegation about the state law offense and instead said that the documents confirm that Elmore was charged with Vigar murders defined by California law. I'm not saying that Elmore proves our point. I'm just saying that Elmore is not relevant. And if anything, it's the same kind of indictment. These kinds of indictments are generally used. The Second Circuit has held that these kinds of indictments are appropriate. And then this court in analogous context has a couple of different ways in which it shows the adequacy of the indictment here. In the money laundering context, that's Lazar Branko. This court said when bringing charges of money laundering, the government need not allege all the elements of the specified unlawful activity, i.e. the underlying offense, very similar to here. And in the CCE context, the continuing criminal enterprise for drug organizations, this court has held that there's no legal requirement that those violations which make up the continuing series, that those need to be specifically listed in the indictment. So we know when there's this overarching crime in a number of ways, other courts and this court have said you don't need to allege all the specific elements. Here, the underlying statutes themselves were alleged and that was sufficient. But if there needed to be some more notice, this indictment as a whole sufficiently alleged those underlying offenses. For the murder charge, look to the death penalty findings. The grand jury made four specific findings of intentional conduct, including that the defendants intentionally killed the victim, intentionally inflicted serious bodily injury. And then there is even a reckless allegation too about intentionally engaging in violence that constituted a reckless disregard for human life. Look at the facts section. It charged that some defendants assaulted, that word of intentionality from Henry, they assaulted and kidnapped Huggins, they transported him to a meeting place, then assaulted and tortured him on Denglas orders resulting in his death. I'd also like to point this court to paragraph 89 of the superseding indictment, which we didn't discuss specifically in the brief. It's the notice of enhanced sentencing factors for the pound one Rico. And there again, the allegations are that the defendants killed Huggins in the course of kidnapping him with citations to those state statutes. And it has that extreme indifference, murder language from the Washington statute, that the defendants under circumstances manifesting extreme indifference to life caused Huggins' death. So there's all these clues in the indictment that the grand jury was actually given all the instructions that the defendants are claiming that there was no notice about. We can see that in this indictment. And in this court's cases, you've indicated that you can look to the whole indictment. We cited those cases in our brief. I'll just, there's there. I'm happy to address harmless error if this court has some questions on that. I guess I would just going back to the first issue, like to address the 28 J letter that the defense counsel filed yesterday, maybe two days ago, where this is, I think on the air, it's an expert issue. And in the 28 J letter, the defense counsel cited two remarks that the judge was making when the district court was considering whether to give a minor role adjustment to this defendant. And he said that the evidence about intent for kidnapping was low. And I just want, I think this court really needs to think about those remarks in the sentencing context in which they were made about minor role. The judge was comparing Erikson to the other participants and thinking about the offenses in three parts. He called it an unholy triad, the kidnapping from the driveway, the torture and the murder. And he said, well, when you're involved in two out of the three, you're a little bit less culpable. So when he was talking, thinking about kidnapping, he was thinking about literally the grabbing at the driveway, which there's no dispute, Erikson wasn't there. The judge even says that he wasn't talking about kidnapping in the technical legal sense. This is that one excerpts of record for Erikson page 23. So he says he's not talking about that, which would include that continued restraint in the shed. And so he's really talking about was, did Erikson grab him from the driveway? And the judge also said, and I don't mean that I have to make fine distinctions about awareness or anything like that when I'm making this decision. Again, he's in a very narrow sentencing context. He's just saying, I'm going to give this guy a minor role adjustment. He is not saying that if he had to make the decision, this court could make if it wanted to go to harmless error, that the evidence wasn't overwhelming in this case. It was overwhelming. We have six cooperators talking about what happened in that shed. That's extraordinary. We have four of those cooperators who all saw some kind of violence. That's extraordinary too. The little bits of little inconsistencies that the defendant tries to highlight are so minor. I think it actually even proves the government's point more. I'm just going to discuss one of them. That's the stabbing of the leg. So Ned Grinelli says, I saw Erikson when he was cutting off the ties of Huggins, the zip ties, I saw him stab him in the thigh. And he said, whoops, and laughed and made it seem like a joke. That's corroborated by a picture of the victim's body that has two stab marks in the thigh. One of the things that the defendant has said is that, that's not, you shouldn't believe it because even though Permanel said, even though Ned Grinelli said that Erikson stabbed him in the thigh, he said upper thigh. We're talking about inches here, inches away, a few inches, like maybe it's the lower thigh, but it's the thigh. And so I think that's actually very consistent. It's corroborated by Rockefeller's testimony that he heard Erikson say that Erikson had stabbed the victim in the thigh. And it's corroborated by one more thing that I'm not thinking of right now. But I think again, that there's, it's so small. Oh, right. So then the defendant says that Huggins still had zip ties on his body. And so that house somehow makes this evidence not believable. But of course, he's no longer attached to the chair. Some of those zip ties were cut off and some weren't. So again, tiny, tiny details. Actually, what you have is that the fact that the defendant, that the cooperators weren't just having a dovetail story, the minor differences is explained by their different vantage points. They were in, in the shed, out of the shed. And it actually, I think, shows their credibility that they were just testifying honestly about what they remembered from where they were and what they saw. Unless the court has any questions about the other issues, the government will rest on its brief. Let me ask my colleagues, either of you have additional questions? No, thank you. I think not. I think not. So, Ms. Daly, you've got part of Ms. Grazer's time as well. I don't know how it totals up, but it looks like four, five, 20. No, wait a minute. We got more. So you got, you got a lot of time. You may or may not want to use it, but there you go. Well, we'll see what questions the court might have. I do want to start with, I think what the court just heard is the government's best case scenario, but that's not how we decide relevance. What we're looking at is could the jury have reasonably found that the defendant's defense was supported and did the expert testimony support that defense? And the answers to both questions are yes. The government says that there's 80 witnesses who all supported Mr. Erd, the overwhelming evidence. Well, 40 of those went to the RICO conspiracy of which Mr. Erickson was acquitted. We also have a jury that deliberated for four days, which is not necessarily consistent with a case where you have multiple eyewitnesses whose credibility is not in doubt. This is a case that was very closely contested and it was closely contested specifically with respect to Mr. Erickson's mental state. The jury struggled with that. We know because it asked a jury question, I believe on the third day of deliberations when it said, when do you have to decide to join a conspiracy? I'm paraphrasing, but they wanted to know if you can join a conspiracy impromptu or whether there has to be advanced planning. So we can infer, we can guess that they might've been considering Mr. Erickson's mental state because that question doesn't relate to any of the other defendants. Let me just ask you this. You're obviously an experienced lawyer. You're great at picking out these issues, but the reality is human beings don't fit things closely together. We're not perfect. We have all these varieties and I look at the huge number of people who from various points testified about what happened here. And in a general sense, I would say the evidence was overwhelming. Now, were there individual little this, little bit of that? I get that. But how do you overcome that problem? I mean, this was a brutal, horrible, nasty thing based upon the nature of this gang. How do you get around the overwhelming evidence aspect of this? Well, Your Honor, it was a club, not a gang. I don't want to join this club. Let me just say. No, certainly. And two co-defendants were acquitted of any RICO conspiracy here. What I would say is that that concern I think is relevant in some cases, but not here where we had two, you know, the government says six cooperators testified about what happened. Yes. Two of them said Mr. Erickson didn't do anything, that he was merely present. Now the jury could say, well, I don't credit those witnesses. I credit, maybe they didn't see everything. Maybe they're trying to protect Erickson. The jury could have reached similar doubts about Pribirnow, Negrinelli, and Jung. So these are not minor discrepancies. These are three witnesses said they saw something, but they each said they saw something different. None of them corroborated each other. Two witnesses corroborated each other that Mr. Erickson didn't do anything. The government said four witnesses saw something. That's incorrect. It was three. The fourth witnesses said he thought he heard somebody, maybe Erickson, say that he had stabbed Huggins in the leg. I can discuss the stabbing in the leg. I think there are serious reasons why the jury may have had reasonable doubt, which is all that's required here, reasonable doubt. But I think the record is adequately detailed in our brief. And with the reasonable doubt standard being the only thing the jury has to find, it could have easily relied on the government's alternative theory. And I think that's why the government presented that alternative theory. They said, jury, even if you don't believe the three incentivized cooperators who tried to point the finger at Erickson but couldn't agree on what he did, even so, he was already guilty because he must have known what was happening to Huggins. Fisher said that Erickson did not know what was happening with Huggins. He was asked, was Mr. Erickson in on the plan for violence? No, he didn't know about it. So there's reasons to doubt that. I wanted to address briefly Judge Wynn's question about capacity, because that's we think that the district court committed a legal error. And I think that the government's in agreement with us on appeal, that evidence is relevant if it goes to a defendant who has capacity to form intent, but might not have under the circumstances here, might not have formed that intent here. And we think that's where we're at with respect to Mr. Erickson's knowledge. Did he take those phone calls and decide, they're asking me to go to the Argo, they're asking me to show them the way to Dagwoods. I know that this has something to do with Huggins, even though no one mentioned Huggins, at least there's no testimony that Huggins was mentioned. Somebody else in Mr. Erickson's circumstances might have put that together. The jury could have reasonably found on these facts with the expert testimony that Mr. Erickson did not. That includes, I mean, the government's arguments, everyone knew about Denklau's violent intentions. And we have expert testimony that Mr. Erickson, Denklau's violent intentions. We have expert testimony that Mr. Erickson does not accurately perceive other people's intentions that the jury never heard. With respect to whether this was going to be dense neuroscience that would be difficult for the jury to understand and use correctly, I want to point out that the court could have limited the testimony to what was easily understandable, including just allowing Dr. Watson to testify about the actual functional cognitive impairments, which is exactly what was deemed admissible and wrong, functional cognitive impairments, and limited the MRIs, the white matter abnormalities, the sort of denser, here's what we know about how the brain works. We could have just limited the testimony to what do we know functionally about how Mr. Erickson's brain works. Where the core defense is diminished capacity, our position is that the defense should have been given the opportunity to create reasonable doubt, particularly in a case where a defendant faces a mandatory life sentence that the district court said it would not have imposed had it had a choice. And I'm happy to answer any questions that I otherwise ask the court to reverse, order a new trial, or alternatively to vacate the sentence. And I appreciate the court's time today. Very well. Are there other questions by my colleagues? No, thank you. Thank you. Thanks to all counsel on this case. We appreciated the case of United States versus Dinklau et al is submitted and the court stands adjourned for the week. This court now stands adjourned. Thank you.
judges: SMITH, NGUYEN, THOMAS